PER CURIAM,
Pursuant to Rule 208(d)(2)(iii) of the Pennsylvania Rules of Disciplinary Enforcement, the Disciplinary Board of the Supreme Court of Pennsylvania (“board”) herewith submits its findings and recommendations to your honorable court with respect to the above-captioned petition for discipline.
I. HISTORY OF PROCEEDINGS
By petition for discipline filed on April 8, 2011, Office of Disciplinary Counsel charged Barry O. Bohmueller with violations of the Rules of Professional Conduct and Rules of Disciplinary Enforcement. Petitioner alleged that respondent participated in the unauthorized practice of law by allowing lay persons to counsel his *451 clients; he failed to communicate properly with his clients concerning their individual estate planning; he failed to inform clients of fee sharing and of his conflicts of interest; and he engaged in conduct involving dishonesty, fraud, deceit and misrepresentation, including the purposeful omission of two of his four IOLTA accounts from his annual attorney registration forms. Respondent filed an answer to petition for discipline on May 23, 2011.
Simultaneous to the filing of the instant petition for discipline, petitioner filed a factually-related petition against Brett B. Weinstein, who was alleged to have acted in cooperation with respondent. The cases were consolidated for disciplinary hearing. Separate hearing committee reports were filed.
Following a pre-hearing conference on August 19, 2011, hearings were held before a District II hearing committee comprised of Chair Michael J. Malloy, Esquire and members Mason Avrigian, Sr., Esquire, and Philip M. Hof, Esquire. The hearings took place on December 7 and December 8, 2011, March 7 and March 8, 2012, July 24 and July 26,2012. Deposition testimony was taken on July 9 and September 19,2012. Closing arguments were heard on December 18,2012. Following the hearing committee’s determination that petitioner had established a prima facie violation of at least one Rule of Professional Conduct or Rule of Disciplinary Enforcement, a dispositional hearing was held on March 27, 2013.
Following the submission of briefs by the parties, the hearing committee filed a report on August 1, 2013 and recommended that respondent be suspended for a period of two years.
*452 No briefs on exception were filed by the parties.
This matter was adjudicated by the Disciplinary Board at the meeting on January 15, 2014.
II. FINDINGS OF FACT
The board makes the following findings of fact:
1. Petitioner, whose principal office is located at Pennsylvania Judicial Center, Suite 2700, 601 Commonwealth Avenue, P.O. Box 62485, Harrisburg, Pennsylvania, is invested, pursuant to Pa.R.D.E. 207, with the power and duty to investigate all matters involving alleged misconduct of an attorney admitted to practice law in the Commonwealth of Pennsylvania and to prosecute all disciplinary proceedings brought in accordance with the various provisions of said Rules of Disciplinary Enforcement.
2. Respondent is Barry O. Bohmueller. He was bom in 1966 and was admitted to practice law in the Commonwealth in 1997. He maintains his office at 29 Mainland Road, Mainland VLG, Harleysville, Pennsylvania 19438. Respondent is subject to the disciplinary jurisdiction of the Disciplinary Board of the Supreme Court of Pennsylvania.
3. Respondent has no history of discipline in Pennsylvania.
4. In August or September of 1999, respondent was introduced to Brian Newmark, a non-lawyer who operated a business known as Estate Planning Advisors (EPA). Mr. Newmark’s business was focused on making sales presentations to senior citizens about the benefits of living trusts. (ODC-115 at 32, 35-37, 49, 65, 67, 291; 89, 132, *453 292-293, 386) Previous to operating EPA, Mr. Newmark worked with Advanced Legal Systems (ALMS), where he engaged in similar activities selling living trusts and annuities. Brett B. Weinstein, Esquire was a “referral attorney” at ALMS.
5. Mr. Newmark contacted respondent after receiving the contact information from Mr. Weinstein, who was a law school friend of respondent. Mr. Newmark talked to Respondent about “having a referral relationship.” Soon after Mr. Newmark and respondent met, they “formed a relationship” whereby Mr. Newmark began promoting, marketing and selling living trusts for respondent. (ODC-115 at 291, 319, 321) Respondent admits that he worked with EPA until the beginning of 2004. (N.T. 12/7/11 at 78-100; ODC-6, 4/30/04 at 245; ODC-164A; ODC-17)
6. In August 1999, respondent leased a “virtual office” at 900 E. Eighth Avenue, Suite 300, King of Prussia, PA 19406, upon which Mr. Weinstein made the down payment. (ODC-1A; N.T. 7/26/12 at 257-258)
7. A “Start Up Form” for the rental of the virtual office reflects that respondent’s “billing address” was 707 W. DeKalb Pike, Suite 2, King of Prussia, PA 19406 (ODC-1B). This was identified as Mr. Weinstein’s office address. (ODC-3,9/19/05 at 193-94)
8. Respondent termed the “virtual office” at 900 E. Eighth Avenue as his “formal mailing address,” but he did not have a desk and chair at that location and used it only occasionally for meetings. (ODC-3, 9/19/05 at 186-187)
9. From 2000 to 2004, respondent shared office space at Mr. Weinstein’s office. (ODC-6,2/20/04 at 127; 4/30/04 at 311)
*454 10. Respondent kept his files at Mr. Weinstein’s office, and the facsimile number of his letterhead was identical to Mr. Weinstein’s facsimile number. (ODC-6, 2/20/04 at 119-21, 144-46)
11. Respondent’s letterhead and advertising stated that his office address was 900 E. Eighth Avenue, Suite 300, King of Prussia PA 19406, and they did not include the address of Mr. Weinstein’s office. (ODC-16; ODC-54)
12. When respondent was asked in interrogatories in civil litigation what his office address was, he gave the “virtual office” address as 900 East Eighth Avenue. (ODC-180 at 64)
13. Respondent’s Pennsylvania Attorney Annual Fee Form for the years 2000-2001; 2001-2002; 2002-2003; 2003-2004; and 2004-2005 stated that the “Primary Location of Lawyer” was “Bohmueller Law Offices, 900 E. 8th Ave, Ste, 300, King of Prussia PA 19406.” (ODC-131)
14. The sign outside of 707 W, DeKalb Pike stated “Weinstein Law Offices, LLC,” but there was no sign with respondent’s name on it. (ODC-3, 9/30/05 at 34)
15. During the time respondent shared office space with Mr. Weinstein, respondent had no secretary, paralegal, bookkeeper or associate attorney, and relied on Mr. Weinstein’s staff. (ODC-3, 9/20/05 at 25-26)
16. According to respondent, he and Mr. Weinstein had an “informal oral agreement” whereby respondent would pay for the shared office space, office staff, reimbursement for supplies and telephone usage. (ODC-6,4/30/04 at 342-43)
*455 17. Respondent and Mr. Weinstein decided what payments respondent made to Mr. Weinstein for the office sharing arrangement, “[t]hrough conversations.” (ODC-6, 4/30/04 at 342-43)
18. Respondent used Mr. Weinstein’s office staff to generate estate planning documents for respondent, including powers of attorney, healthcare powers of attorney, living wills, pour-over wills, and revocable living trusts. (ODC-6, 4/30/04 at 321-27)
19. EPA marketed itself and respondent through direct mail and held seminars at restaurants where senior citizens were provided a free meal and were told that probate was something that senior citizens must avoid. (N.T. 12/7/11 at 86, 88-89, N.T. 3/7/12 at 28-29)
20. EPA held itself out as a business comprised of highly trained advisors in the field of estate planning. (N.T. 12/7/11 at 78-100; ODC-6, 4/30/04 at 245; ODC-164A; ODC-17)
21. When senior citizens expressed interest in living trusts by responding to EPA’s solicitations, EPA dispatched a non-attorney to the individual’s home to discuss estate planning.
22. Victoria Larson and John Wight worked for EPA.
23. Ms. Larson was credible and provided reliable testimony.
24. In 2000, Ms. Larson worked at EPA with the title “Certified Senior Advisor,” obtained after three or four days of training. She previously worked at a similar business known as ALMS, where she had sold Mr. Weinstein’s trusts to senior citizens.
*456 25. Ms. Larson went to the homes of senior citizens to speak about the benefits of a living trust, which she stated were for probate avoidance, tax savings, attorney fee avoidance, and quicker distribution of assets. Ms. Larson had respondent’s fee agreement (BB-35) and business card, on which she wrote her name and telephone number. (ODC-31A)
26. The fee agreement stated that respondent would provide a living trust for the client, and it contained a toll-free “Client Services” number which was the number for EPA.
27. Ms. Larson used a document entitled “BOHMUELLER LAW OFFICES Confidential Information for Estate Plan” (ODC-162A) to record personal information about the client’s testamentary wishes, and an “asset worksheet” for the financial Information. (ODC-162F)
28. On the initial visit to sell a Bohmueller living trust, Ms. Larson obtained the forms that she used from the EPA office, and not from respondent. These included a form on Bohmueller letterhead. (ODC-162B)
29. Ms. Larson was only paid for the visit if she sold a trust. (N,T. 3/7/12 at 6-8, 16-17, 21-22, 29-34, 37-46, 49-53, 139-40, 149-50)
30. When she delivered the completed trust, Ms. Larson went through each section of the trust and the living will and explained the provision. (N.T. 3/7/12 at 63-70. 124-27; 140-43)
31. Ms. Larson assisted the clients in determining how to fund the trust. When the client had a question, Ms. *457 Larson determined if the question should be answered by respondent, who was contacted infrequently. (N.T. 3/7/12 at 63-70, 124-27, 140-43)
32. Ms. Larson was not paid for the delivery, but obtained a commission from EPA if she sold an annuity. Ms. Larson claimed that she delivered fifty, or sixty living trusts over a three-year period, one or two “in a good week” (N.T. 3/7/12 at 63-70, 124-27,140-143)
33. Mr. Wight worked for EPA as a “delivery agent.” (N.T. 3/7/12 at 63-70; 124-27, 140-143)
34. Mr. Wight delivered trusts for EPA from approximately 2000 to 2005. He had worked with Mr. Weinstein at ALMS, which he stated was “substantially similar” to EPA. At EPA, Mr. Wight was respondent’s delivery agent for several of respondent’s trusts. (ODC-116 at 119, 134, 159)
35. Mr. Wight was credible and provided reliable testimony.
36. The EPA “business model” called for the delivery agent to “explain in detail to the consumer the meaning and significance of the various legal documents” being delivered. (ODC-116 at 133-34)
3 7. The delivery agent had the client sign two documents which Mr. Wight obtained from respondent’s office. One document, the “explanation of trust and delivery of trust,” stated that respondent had asked the particular agent to explain the trust “In detail.” (ODC-28)
38. The other document, the “Pennsylvania Delivery Receipt and Checklist,” referred to the agent as a “representative” of Bohmueller Law Offices. (ODC-29)
*458 39. Mr. Wight explained that the EPA business model “helped to identify clients who likely needed certain insurance products.” Mr. Wight was not paid by respondent when he worked as a delivery agent at EPA; rather, if he sold an insurance product, he would receive a commission from EPA. (ODC-116 at 126-134, 174)
40. Glenn Larson is a high school graduate who worked at EPA from 2001 until 2005. Mr. Larson’s business card stated that he was a “Certified Senior Advisor,” a title he obtained after reading on his own and having four days of training. (ODC-123 at 16-22; ODC-164A)
41. Mr. Larson was credible and provided reliable testimony.
42. Mr. Larson participated in seminars given by EPA, at which the attendees were given dinner and one of the topics discussed was living trusts. (ODC-123 at 71-75)
43. Mr. Larson went to the homes of senior citizens at the rate of one each day to discuss the drawbacks of probate and to determine if a living trust would be appropriate for them. (ODC-123 at 76; 84-86, 92-93)
44. Respondent was the lawyer to whom Mr. Larson referred the clients. In the minority of cases, the individual decided to use a different lawyer. (ODC-123 at 115-17, 178-79, 192-83)
45. Mr. Larson gathered information about the clients and their assets and collected a check in the range of $600 to $1,200 for the attorney fees. (ODC-123 at 88-89, 105)
46. Mr. Larson would deliver the trust and review the trust with the client. He brought to the client’s home the information about the client’s assets to discuss “their *459 estate plan” and “any options they may need.” (ODC-123 at 96, 106)
47. Mr. Larson was not paid for the sale of the living trust and made no base salary; rather, his sole source of income was commission on the sale of annuities. (ODC-123 at 90-91)
48. Respondent made periodic payments to Mr. Newmark for his efforts to market and sell living trusts. The payments would sometimes be based on how many clients EPA had given respondent and sometimes it was based on “how much money [Newmark] needed.” (ODC-115, 5/21/04 at 329-30)
49. Sales agents were paid by EPA on a per trust basis for every trust they sold. (ODC-115 at 336, 338)
50. In 2002, EPA received income of approximately $1.9 million from seven insurance companies. (ODC-115 at 312)
51. Respondent provided Mr. Newmark with two form documents. One was the “explanation of trust and delivery of trust” (ODC-28) on which Mr. Newmark filled in the name of the delivery agent, although the document recited that respondent had selected the named delivery agent to explain the trust in detail. (ODC-115 at 354-58)
52. Respondent also provided the “Pennsylvania Delivery Receipt and Checklist,” which indicated that the EPA delivery agent was a “representative” of respondent’s law office. (ODC-29; ODC-1156 at 355-58)
53. As confirmed by Mr. Newmark, respondent did not supervise the agents who went out and sold the living trust. (ODC-115 at 301-02)
*460 54. It was respondent’s responsibility to prepare the deed to transfer the residence into the living trust, (ODC-115 at 398,400)
55. Respondent’s participation in unethical conduct is illustrated by the experience of a sampling of respondent’s clients, as described below.
56. Mary Lynch, a former secretary, was 83 years old in 2001, when she bought a Bohmueller trust from EPA. (N.T. 3/27/13 at 44-58)
57. Mrs. Lynch did not buy an annuity at that time. In 2003, Mrs. Lynch was in the early stages of dementia. (N.T. 3/27/13 at 44-58)
58. Mrs. Lynch’s son, John Lynch, went to her home to prepare her tax return. Mrs. Lynch, who used to have a total of $60,000 or $70,000 in the bank, only had $104.00. When her son asked her what happened to the money, she stated that she did not know. (N.T. 3/27/13 at 44-58).
5 9. Mr. Lynch determined that his mother had purchased an annuity from Victoria Larson of EPA. The annuity would not begin to pay Mrs. Lynch until 2014, when she would have been 96 years old. (N.T. 3/27/13 at 44-58)
60. In 2001, Thomas Walker and his brother, Arthur Walker, were visited by Victoria Larson of EPA, who came to their home and gave them a brochure entitled “take control of tomorrow” (ODC-31), and respondent’s professional card, on which she wrote the number for EPA.
61. Thomas Walker was credible and provided reliable testimony.
*461 62. The Walkers gave Ms. Larson two checks made out to Bohmueller Law Offices and Thomas Walker, Jr. signed a document on Bohmueller letterhead confirming that respondent would prepare the trust. (ODC-30, 9/15/05 at 168; 172, 179; ODC-31A; ODC-162B)
63. Ms. Larson also listed the Walkers’ assets on an “asset worksheet” and their testamentary wishes on the form, “Bohmueller Law Offices Confidential Information for Estate Plan.” (ODC-162A &162F)
64. The Walkers neither met nor spoke to respondent. (ODC-30, 9/16/05 at 189-90)
65. John Wight delivered the living trust and ancillary documents to the Walkers in a binder which contained respondent’s business card.
66. Thomas Walker introduced Mr. Wight to the Walkers’ neighbors (witnesses for their trusts) as his lawyer, and Mr. Wight did not correct Mr. Walker. (ODC-30, 9/15/05 at 189-90)
67. Arthur Walker was credible and provided reliable testimony.
68. Mr. Wight explained some of the provisions of the trust to the Walkers. (ODC-30, 9/15/05 at 193)
69. The Walkers purchased annuities in an amount over $3,000,000. (ODC-30, 9/19/05 at 10-11)
70. In 2001, Margaret and Felix Miller were solicited by a telemarketer, and Michael Ciccone of EPA, a non-lawyer, then came to their home. (ODC-51, 9/22/05 at 198-200; 9/26/05 at 88-89)
71. Neither of the Millers ever met nor spoke with *462 respondent. (ODC-51,9/22/05 at 206; BOH-17 at 35,106)
72. Mr. Ciccone advised the Millers that a living trust was superior to a will. (ODC-51, 9/22/05 at 219; 9/26/05 at 75-76)
73. The Millers gave Mr. Ciccone a check for $1,795 made out to respondent, and provided information for the “Asset Worksheet” and “Bohmueller Law Office Confidential Information for Estate Plan.” (ODC-48; BOH-17 at 92-93)
74. Mr. Wight delivered the Bohmueller living trust and told the Millers the topic that each section of the trust addressed. (ODC-51, 9/22/05 at 235-38)
75. Mrs. Miller was credible and provided reliable testimony.
76. Mrs. Miller did not understand the documents Mr. Wight put in front of her, but she thought he was a lawyer and was working for “our good.” (ODC-51, 9/22/05 at 243)
77. The Millers asked Mr. Wight for a business card, and he gave them a Bohmueller Law Offices business card, on which he wrote his name and telephone number. (ODC-51, 9/22/05 at 228-31; BOH-17 at 95)
78. Mrs. Miller thought Mr. Wight was a lawyer because a living trust had to be drafted by a lawyer. (ODC-51, 9/22/05 at 228-31; BOH -17 at 95)
79. Mr. Miller thought Mr. Wight worked for respondent. (ODC-51, 9/22/05 at 228-31; BOH-17 at 95)
80. At no time did Mr. Wight disclose to the Millers that he was not an attorney. (ODC-51, 9/22/05 at 228-31; *463 BOH-17 at 95)
81. In 2001, the late Walter and Susan Gilmour were in their 80’s. The Gilmours’ son, Walter Gilmour, Jr. lived on his parents’ farm and acted as his parents’ caretaker. (N.T. 3/7/12 at 169, 211-13, 301, 209-10, 170-74)
82. Mr. Gilmour was credible and provided reliable testimony,
83. A representative from an entity called The Patriot Group, Mike Hamilton, came to the Gilmours’ home and sold them a revocable living trust, telling them that without a revocable living trust, only 15% of their estate would remain after taxes and probate.
84. Mr. Gilmour and his parents neither spoke with nor met respondent.
85. The revocable living trust and the ancillary documents were delivered to the Gilmours by Steve Strope of The Patriot Group. The Gilmours signed the “Pennsylvania Delivery and Receipt Checklist,” (ODC-58), which referred to Mr. Strope as a “representative of Bohmueller & Associates Law Offices.”
86. Mr. Gilmour believed that respondent was a lawyer working with The Patriot Group and that Mr. Strope was an estate planner and advisor, not an insurance salesman. (N.T. 3/7/12 at 179-80, 181-84, 187-88, 200, 205, 235, 256,258,278-79,312-16)
87. Mr. Strope reviewed the trust with the Gilmours and explained the terms of the trust to them. (N.T., 3/7/12 at 179-80, 181-84, 187-88, 200, 205, 235, 256, 258, 278-79,312-316)
*464 88. The Gilmours liquidated securities worth $2.8 million dollars to buy four annuities. (N.T. 3/7/12 at 179-180, 181-84, 187-88, 200, 205, 235, 256, 258, 278-79, 312-16)
89. Todd Garry worked at The Patriot Group from 1999 to 2002, delivering Bohmueller living trusts. While working at The Patriot Group (and subsequently as a delivery agent for Mr. Weinstein at American Family Heritage), Mr. Garry delivered approximately 600 to 1,000 living trust binders. (N.T. 3/7/12 at 323-29, 342)
90. Harcourt and Barbara Trimble bought a Bohmueller living trust in 2001, when Mr. Trimble was 89 and Mrs. Trimble was 84. (N.T. 3/8/12 at 135-37, ODC-62; ODC-63)
91. Harcourt M. Trimble, III is the Trimbles son and was credible and provided reliable testimony.
92. When the trust was delivered, the Trimbles and Mr. Strope signed the “Pennsylvania Delivery Receipt and Checklist.” (ODC-63) The Trimbles bought an annuity through Mr. Strope. (N.T. 3/8/12 at 135-137, ODC-62; ODC-63)
93. After his parents’ death, Mr. Trimble contacted Mr. Strope and suggested that he, Mr. Trimble, engage respondent to handle his parents’ estate.
94. Mr. Strope stated that respondent was busy and suggested that Mr. Trimble call Mr. Weinstein, which Mr. Trimble did. Although Mr. Trimble engaged Mr. Weinstein and met with him on numerous occasions, Mr. Trimble received invoices on Bohmueller letterhead handed to him by Mr. Weinstein.
*465 95. Mr. Trimble received correspondence on Bohmueller letterhead. Mr. Trimble made out fee checks to Mr. Weinstein, which were endorsed to Bohmueller Law Offices.
96. Respondent’s check register for September 8,2003 reflects that he paid two checks to Weinstein Law Offices with the notation that they were for the Trimbles’ estates. (ODC-9A, checks 1271 and 1272)
97. Although Mr. Trimble did not deal with respondent during the representation, he concluded, from the documents and conduct, that Mr. Weinstein and Mr. Bohmueller worked together. (N.T. 3/8/12 at 160-162, 168-70, 174-75, 179-80, 183, 286, 299-302; ODC-97D1, D2; ODC-97E; ODC-97H; ODC-97G)
98. Margie Brennan Trefz’s parents, Gilbert and Joanne Brennan, were in their 70’s in 2001. (N.T. 12/8/11 at 288-289)
99. Ms. Trefz was credible and provided reliable testimony.
100. In 2001, Mr. and Mrs. Brennan obtained a Bohmueller revocable living trust. (ODC-68)
101. When Mr. Brennan was hospitalized in 2003, Victoria Larson brought to the hospital the Brennans’ redrafted powers of attorney, accompanied by a cover letter dated March 6, 2003 on Bohmueller Law Offices letterhead, signed by a member of Mr. Weinstein’s legal staff. (ODC-71 A; N.T. 7/26/12 at 210-211)
102. Ms. Larson had notarized the powers of attorney and discussed the changes with the Brennans, (N.T. 12/8/11 at 302-303, 307-13)
*466 103. To Ms. Trefz’s knowledge, her parents never discussed the changes to the powers of attorney with respondent. (N.T. 12/8/11 at 302-303, 307-13)
104. The Brennans ’ powers of attorney that accompanied the March 6, 2003 letter from Bohmueller Law Offices stated on the upper right hand side; “RECORD AND RETURN TO: Weinstein Law Offices.” (ODC-176A and ODC-176B)
105. Mr. Weinstein called Ms. Trefz and told her that “there were going to be potential clients calling” her, and would she mind if “they” gave Ms. Trefz’s phone number to potential clients “so that [the potential clients] could ask questions about the practice and whether [the potential clients] should use them.” (N.T. 3/8/12 at 111)
106. During the period when respondent practiced law out of Mr. Weinstein’s office, respondent had four IOLTA accounts and one business operating account at Royal Bank. (ODC-160; ODC-11)
107. Between 2001 and 2004, 3,155 checks containing the names of individuals and couples made out to Bohmueller Law Offices were deposited in respondent’s IOLTA accounts. (ODC-160; ODC-14)
108. The residences of the payers of the checks span the Commonwealth from Philadelphia to Pittsburgh and communities north and south, including Reading, Coal Center, East Stroudsburg, Bloomsburg, Harrisburg, Beaver Falls, Pocono Lake and State College, among other locales. (ODC-14)
109. During the time that respondent practiced law from Mr. Weinstein’s office, Mr. Weinstein, using a *467 Bohmueller signature stamp, wrote hundreds of checks from respondent’s IOLTA accounts, including checks to Weinstein Law Offices; to Bohmueller; and to estate planning businesses. (ODC-9; ODC-6,4/30/04 at 424-31; N.T. 7/26/12 at 265)
110. On his Pennsylvania attorney registration paperwork, respondent only listed two of his four IOLTA accounts at Royal Bank, Nos. 1008127 and 1008223. (ODC-131)
111. During the period 2000-2004, respondent failed to list two additional IOLTA accounts that were maintained at Royal Bank, Nos. 1010577 (designated “IOLTA Account III”) and 1008610 (designated “IOLTA Account IV”).
112. Respondent did not maintain complete records of his IOLTA accounts. (ODC-9A; N.T. 12/7/11 at 324-26; ODC-6,4/30/04 at 358-59, 362-63, 368, 386)
113. For all checks written on respondent’s four IOLTA accounts and his business operating account from 2001 to 2004. Including those written by Mr. Weinstein, checks to respondent totaled approximately $510,000; checks to Mr. Weinstein totaled approximately $1,210,000. (ODC-11)
114. For the years 2001 to 2004, checks to Mr. Weinstein from respondent’s four IOLTA accounts and one business account totaled $622,800 in 2001; $485,425 in 2002; $77,020 in 2003; $34,200 in 2004. (ODC-11)
115. For the years 2001 to 2004, checks to respondent from respondent’s four IOLTA accounts and one business account totaled: $184,551.50 in 2001; $112,965 in 2002; $164,680 in 2003; $54,328 in 2004. (ODC-11)
116. Mr. Weinstein did not have a single paper or *468 document to evidence that respondent was paying him for what Mr. Weinstein claimed were capital improvements to an office that respondent vacated in or about 2004, (N.T. 7/26/12 at 294-95)
117. Mr. Weinstein has no documents that describe the precise expenses for which checks were being written to Mr. Weinstein from respondent’s IOLTA accounts and business account. (N.T. 7/26/12 at 316-17)
118. Respondent has no records other than his bank records and his client files, reflecting the purpose of the payments to Mr. Weinstein. (ODC-160; ODC-6,4/30/04 at 366-70)
119. Respondent was not a partner with Mr. Weinstein, but he shared fees with Mr. Weinstein and failed to inform his clients of this. (BB-34)
120. John A, Terrill, Esquire, testified as an expert witness for petitioner. He was credible and provided reliable testimony.
121. In Pennsylvania, probate is a filing with modest fees and the estate settlement process is the same, and involves the same legal fees and inheritance tax returns for a will-based or living trust-based estate.
122. The comparison to the American Family “Simple Will/No Will” charts (ODC-164C) and Bohmueller’s direct mail advertising are false and misleading. (N.T. 7/24/12 at 50; ODC-16).
123. Mr. Terrill described the proper method of assisting the client in preparing an estate plan: assemble and analyze client information and assets; meet with the client to discuss intentions; review existing estate planning *469 documents, the client’s tax situation and prospects for tax planning; determine the client and potential beneficiaries’ ages and health, and a host of related information and issues. (N.T. 7/24/12 at 17-178, 268-301)
124. Respondent’s direct mail advertisement touted the alleged benefits of a living trust, such as to “AVOID PROBATE COURT,” “MAINTAIN TOTAL CONTROL of your assets”, “AVOID COURT INVOLVEMENT should you become incompetent due to a stroke or Alzheimer’s”, “PROTECT YOUR ESTATE from unnecessary taxes” and “PROVIDE PRIVACY to your family in this time of emotional distress.” (ODC-16; N.T. 12/7/11 at 316)
125. Respondent advertised that, “A will does NOT prevent probate; in fact, it is a direct ticket to probatel” and “[probate] is often a complicated legal process of finding your assets, paying your bills, and then transferring assets to your loved ones.” (ODC-16; N.T. 12/7/11 at 316)
126. The Bohmueller advertisement implies that there is a significant distinction between settlement of a will-based plan and a living trust-based plan, which is false and misleading, and raises unfounded “negatives” which allegedly accompany a will-based estate, such as probate, court involvement, expense, loss of control of one’s assets and delay. (N.T. 7/24/12 at 91-105)
127. Also misleading were handwritten charts (ODC-50) presented to respondent’s clients, the Millers, by EPA agents. The charts reflected that the Millers would have “court costs” of $70,000 with a will. However, the fee to probate their estate, valued at $700,000, in fact would have been from $700 to $800. (ODC-51, 9/22/05 at 200; N.T. 7/24/12 at 110).
*470 128. The chart also provided an unfounded estimate of attorney’s fees and executor fees of $35,000. (ODC-50, N.T. 7/24/12 at 110-11)
129. Respondent presented three witnesses who testified concerning his character at the March 27, 2013 hearing. The witnesses were Carolyn Bohmueller, Esquire, respondent’s wife; Nancy Becker, the Recorder of Deeds in Montgomery County; and David A. Keeley, Sr., Esquire, a former magisterial district judge.
130. Although respondent’s witnesses attested to his good attributes, none contradicted the fact that the conduct at issue was wrong.
131. Respondent ceased engaging in the misconduct in 2004 and has refrained from that conduct for over nine years.
132. At the time that respondent ceased his misconduct, an interim consent decree was entered on December 14, 2004 in the case of Commonwealth of Pennsylvania v. Estate Planning Advisors, Brett B. Weinstein and Barry O. Bohmueller, et al., No. 74 MD 2004 (Pa. Cmwlth.) which stated that, inter alia, “defendant Weinstein will continue to refrain from authorizing and utilizing laypersons to provide legal advice to his clients.” (ODC-211)
13 3. Office of disciplinary counsel served DB-7 requests for statement of respondent’s position on respondent and Mr. Weinstein in June of 2005, alleging that they were engaging in misconduct. The board deferred the proceedings in October of 2005 until final disposition of the attorney general action. (ODC-185)
134. Respondent was aware by 2004 that his activities *471 as related to the living trusts were being investigated.
135. Respondent did not express remorse for his conduct nor any acknowledgement that his misconduct violated the ethical rules.
III. CONCLUSIONS OF LAW
By his actions as set forth above, respondent has violated the following Rules of Professional Conduct and Rules of Disciplinary Enforcement:
1. RPC 1.2(a) — Subject to paragraphs (c) and (d), a lawyer shall abide by a client’s decision concerning the objectives of representation and, as required by Rule 1.4, shall consult with the client as to the means by which they are to be pursued. A lawyer may take such action on behalf of the client as is impliedly authorized to carry out the representation. A lawyer shall abide by a client’s decision whether to settle a matter. In a criminal case, the lawyer shall abide by the client’s decision, after consultation with the lawyer, as to a plea to be entered, whether to waive jury trial and whether the client will testify.
2. RPC 1.4(b) — A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.
3. RPC 1.5(e) — A lawyer shall not divide a fee for legal services with another lawyer who is not in the same firm unless (1) the client is advised of and does not object to the participation of all the lawyers involved, and (2) the total fee of the lawyers is not illegal or clearly excessive for all legal services they rendered the client.
4. RPC 1.7(a)(2)—Except as provided in paragraph (b), a lawyer shall not represent a client if the representation *472 involves a concurrent conflict of interest. A concurrent conflict of interest exists if there is a significant risk that the representation of one or more clients will be materially limited by the lawyer’s responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.
5. RPC 5.1(c)(1) —A lawyer shall be responsible for another lawyer’s violation of the Rules of Professional Conduct if the lawyer orders, or with knowledge of the specific conduct, ratifies the conduct involved.
6. RPC 5.5(a) (former and current versions)—Alawyer shall not practice law in a jurisdiction in violation of the regulation of the legal profession in that jurisdiction, or assist another in doing so.
7. RPC 5.7(c) —Alawyer who is an owner, controlling party, employee, agent, or is otherwise affiliated with an entity providing nonlegal services to a recipient is subject to the Rules of Professional Conduct with respect to the nonlegal service if the lawyer knows or reasonably should know that the recipient might believe that the recipient is receiving the protection of a client-lawyer relationship.
8. RPC 8.4(a) — A lawyer shall not violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another.
9. RPC .8.4(c) —A lawyer shall not engage in conduct involving dishonesty, fraud, deceit or misrepresentation.
10. Pa.R.D.E.203(b)(3) via PaJR.D.E. 219(d)(l)(iii) — Which states that on or before July 1 of each year all attorneys required by this rule to pay an annual fee *473 shall file with the attorney registration office a signed or electronically endorsed form prescribed by the attorney registration office in accordance with the following procedures: (1) The form shall set forth ... (iii) The name of each financial institution in this Commonwealth in which the attorney on May 1 of the current year or at any time during the preceding 12 months held funds of a client or a third person subject to Rule 1.15 of the Pennsylvania Rules of Professional Conduct. The form shall include the name and account number for each account in which the lawyer holds such funds, and each IOLTA account shall be identified as such. The form provided to a person holding a limited in-house corporate counsel license or a foreign legal consultant license need not request the information required by this subparagraph.
IV. DISCUSSION
This matter is before the disciplinary board for consideration of the charges against respondent alleging numerous violations of the Rules of Professional Conduct. Petitioner bears the burden of proving, by a preponderance of the evidence, that respondent’s actions constitute professional misconduct. This burden must be established by clear and satisfactory evidence. Office of Disciplinary Counsel v. Surrick, 749 A.2d 441 (Pa. 2000). The record consists of nine days of testimony and numerous exhibits, following review of the record in its entirety, the board concludes that petitioner proved that respondent, acting in concert with attorney Brett Weinstein, participated in a living trust scheme in which he assisted nonlawyers in the unauthorized practice of law, conducted his practice in a dishonest manner, placed his own economic interests above those of his clients, and failed to give clients the *474 required advice and counsel to which they were entitled.
Respondent was admitted to the practice of law in Pennsylvania in 1997. In 2000, he connected with his law school friend, Brett Weinstein, who essentially set him up in practice at Mr. Weinstein’s office. Although respondent listed the address of a “virtual office” on his letterhead and in his filings with the disciplinary board, this “office” did not contain any furniture and was not used by respondent to practice law. Instead, respondent used Mr. Weinstein’s staff and facilities and allowed Mr. Weinstein access to respondent’s IOLTA accounts.
The nature of respondent’s practice with Mr. Weinstein consisted of drawing up living trusts. Respondent was associated with EPA and other similar businesses, which targeted senior citizens as potential clients, holding seminars and making telephone and direct mail solicitations. The message of these businesses was that probate in Pennsylvania should be avoided by these senior citizens. EPA and others held out that having a revocable living trust was the answer to the “probate problem.” Respondent’s own direct mail advertising echoed the agents’ sales pitches about the need for a living trust. These materials exaggerated the benefits of living trusts and contained deliberate misrepresentations. (ODC-16) After the initial solicitation, nonlawyer agents of EPA and like businesses went to the homes of the senior citizens. As evidenced by the testimony of Victoria Larson, John Wight, and Glenn Larson, the agents gave false and misleading advice to the clients about the need to avoid probate in Pennsylvania on the many occasions between 2000 and 2004 that they visited the homes of clients in their attempts to sell Bohmueller living trusts.
*475 Respondent’s status as a lawyer gave legitimacy to the estate planning businesses. It was the means by which the agents could persuade the potential clients to obtain the living trust, which brought the agents one step closer to their ultimate goal of selling annuities to the clients. The agents carried respondent’s business card and his fee agreements, which recited that respondent would provide a living trust. Not only did these senior citizens believe that the agents were working for respondent, the evidence demonstrates that at least several believed that the agent was a lawyer.
The trust was delivered to each client and explained not by respondent but by a nonlawyer delivery agent. John Wight explained that the EPA “business model” required that the delivery agent provide an explanation of the trust to the client. Along with this explanation, a letter from respondent was given to the client, which recited that respondent had asked the delivery agent to explain the trust “in detail.” Other documents given to the clients noted that the agents were “representatives” of respondent’s law office.
As for respondent, he had minimal if any, interaction with his clients, and he received the clients’ information through the employees of the sales company. Not only did he fail to communicate with his clients about the representation and the clients’ objectives, he allowed the nonlawyer agents to step into his role and counsel and advise his clients without his presence or oversight. Clearly, respondent had no opportunity to personally consider the clients’ assets or even know if these clients had the mental capacity to enter into the living trust, nor it seems, did he care. His pecuniary interests in the living *476 trust businesses permeated his participation in the process, and compromised his ability to act in his clients’ best interests.
As referenced above, respondent and Mr. Weinstein were essentially practicing law together and sharing fees with no written agreement giving structure to the relationship. Although Mr. Weinstein procured a virtual office for respondent, in fact respondent conducted his practice out of the Weinstein office. Respondent had IOLTA accounts in his name, but in reality, Mr. Weinstein was able to access these accounts and used a Bohmueller signature stamp to write hundreds of checks from respondent’s IOLTA Accounts, including checks to Weinstein Law Office, to respondent, and to estate planning businesses.
Respondent acted dishonestly when he failed to disclose two of his four IOLTA accounts on his annual attorney registration forms filed with the disciplinary board. While he claimed that the omissions were a clerical error, it is of great concern that these accounts held funds that resulted from the estate planning scheme. For all checks written from respondent’s four IOLTA accounts and his business operating account from 2001 to 2004, including those written by Mr. Weinstein, checks to Mr. Weinstein totaled approximately 1.2 million dollars. Incredibly, Mr. Weinstein claimed that these checks were written by respondent to pay for capital improvements to an office. There is no documentary evidence to describe the precise expenses for which checks were being written to Mr. Weinstein from respondent’s IOLTA accounts and business account. The fact that respondent failed to keep records of the two IOLTA accounts, coupled with the fact that he listed a virtual office address on the same attorney registration *477 forms indicates his knowledge that he was engaged in an unethical scheme. Because respondent has committed violations of the rules by perpetuation of a scheme which allowed others to engage in the unauthorized practice of law for his financial benefit, omitting reference to two of his four IOLTA accounts, and splitting fees when he was not authorized to do so, respondent must be sanctioned.
The unauthorized practice of law is at the heart of this matter. We note that trust marketing schemes have repeatedly been found to violate the proscription against the unauthorized practice of law. Attorneys from around the country have been disciplined for engaging in the type of conduct found to have occurred in the instant matter. In the matter of Cincinnati Bar Association v. Kathman, 92 Ohio St.3d 82 (Ohio 2001), an attorney maintained a relationship with a company that sold living trusts. It was concluded that the attorney provided advice too late in the process because the nonlawyer had already given legal advice to the client upon which the decision had already been based. In addition, the reviewing attorney added a degree of credibility to the legality of the company and the advice that had been previously given. Similar results have been obtained in cases in Missouri, Colorado and Washington. See in Re Mid-America Living Trust Associates. Inc. v. et. al., 927 S.W. 2d 855 (Mo. 1996); People of the State of Colorado v. Michael M. Laden, 893 P.2d 771 (Colo. 1995); In re Disciplinary Proceeding Against Shepard, 169 Wash. 697 (Wash, 2010).
In Pennsylvania, the Supreme Court imposed a suspension of one year and one day on a lawyer who worked as a review attorney for an estate planning company. Office of Disciplinary Counsel v. Anonymous *478 (G. Jeffrey Moeller), 53 DB 2000 (Pa. 2002). In its report, the disciplinary board addressed “the issue of whether a lay advisor engages in the unauthorized practice of law by counseling a client to create a living trust. “The board noted that the “fundamental concern” was that the “goal of the [estate planning business] was not to provide [the client] with good advice about the disposition of her estate; it was to sell her a living trust package. By the time the matter even reached [Moeller], the advice had been given, the decision made, and the money was in hand.” (D. Br. Rep. 5/16/02 at 10). Mr. Moeller reviewed, modified and finalized “dozens” of trusts from the spring of 1996 to the fall of 1997. Mr. Moeller’s actions enabled a nonlawyer entity to practice law in Pennsylvania, in addition, Mr. Moeller was found to have practiced law while on inactive status.
The Supreme Court has held time and again that lawyers who engage in the unauthorized practice of law have committed serious misconduct. The fact patterns of these cases have often involved attorneys who were on inactive status and continued to practice law. In recent years, where an attorney engages in such misconduct, the court has seen fit to impose a suspension of one year and one day. Office of Disciplinary Counsel v. Peter William DiGiovanni, No. 36 DB 2008 (Pa. 2009); Office of Disciplinary Counsel v. Sharon Goldin-DidInsky, No. 87 DB 2003 (Pa. 2004).
Assisting another in the unauthorized practice of law is equally serious, and deserves the same disciplinary sanction as when an attorney engages in the unauthorized practice of law. Office of Disciplinary Counsel. v. Jeffry Pearson, No. 88 DB 2008. (Pa. 2011). Mr. Pearson assisted *479 a disbarred attorney in the unauthorized practice of law. After he entered his appearance in a case, Mr. Pearson allowed the disbarred lawyer to advise the clients, who were actually the disbarred attorney’s former clients. Mr. Pearson was suspended for a period of twenty months.
Respondent’s conduct in the instant matter is more serious than that in the Pearson matter, as he assisted laypersons in practicing law. The agents that respondent used to advise his clients had no training or knowledge of the law, and their misleading advice was tailored to achieve their true goal of selling annuities. Based on the number of trusts sold over the four years that respondent engaged in this conduct, it is safe to say that he enabled many nonlawyers to illegally practice law, and not just one, as in the Pearson case.
In addition to the unauthorized practice of law, respondent engaged in deception of the Pennsylvania Supreme Court by misrepresenting his office location and the existence of two IOLTA accounts on his attorney registration forms, and engaged in improper fee sharing with Mr. Weinstein.
Respondent has yet to acknowledge or show remorse for his wrongdoing. The fact that he ceased working with laypersons in selling financial products in 2004 is not a compelling mitigating factor. It is apparent that respondent extricated himself from his business arrangement at that time because he was aware that his conduct, and that of Mr. Weinstein, was being investigated by the Attorney General of Pennsylvania and Office of Disciplinary Counsel.
From 2000 to 2004, respondent’s practice was conducted in a fraudulent manner designed to enrich *480 himself at the expense of his clients, to whom he utterly failed to render the professional and ethical services they were entitled to receive. Respondent’s misconduct is egregious and warrants a severe sanction. We respect the hearing committee’s recommendation of a suspension for two years, but in light of the totality of the facts and circumstances of respondent’s four year long pattern of misconduct inflicted upon the unsuspecting public, most of whom were elderly citizens, and compounded by his lack of remorse, we feel compelled to recommend that he be disbarred. Disbarment is reserved for the most egregious matters. Office of Disciplinary Counsel v. Stern, 526 A.2d 1180 (Pa. 1987). Respondent’s actions deserve the maximum sanction,
V. RECOMMENDATION
The Disciplinary Board of the Supreme Court of Pennsylvania unanimously recommends that the respondent, Barry O. Bohmueller, be disbarred from the practice of law.
It is further recommended that the expenses incurred in the investigation and prosecution of this matter are to be paid by the respondent.
ORDER
And now, this 23rd day of January, 2015, upon consideration of the report and recommendations of the disciplinary board dated March25,2014, and following oral argument, it is hereby ordered that Barry O. Bohmueller is disbarred from the bar of this Commonwealth and he shall comply with all the provisions of Rule 217, Pa.R.D.E. It is further ordered that respondent shall pay costs to the Disciplinary Board pursuant to Rule 208(g), Pa.R.D.E.
*481 Mr. Chief Justice Saylor, Madame Justice Todd, and Mr. Justice Stevens join the order.
Messrs. Justice Eakin and Baer dissent in favor of a five-year suspension.